T.C. Memo. 2003-67


UNITED STATES TAX COURT


ALICE M. BEAGLES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3034-02.                    Filed March 6, 2003.


Alice M. Beagles, pro se.

<u>Gary M. Slavett</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, <u>Judge</u>:  The petition in this case was filed in
response to a notice of final determination granting in part and
denying in part petitioner's claim to abate interest on income
tax liabilities for 1983 and 1984 pursuant to section 6404(e).
After concessions, the sole issue for decision is whether the

failure to abate the balance of the interest was an abuse of discretion.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Pacific Palisades, California, at the time that she filed her petition.

During 1983 and 1984, petitioner and her husband Robert Beagles (the Beagles) were limited partners in Jackson & Associates (Jackson). The Beagles purchased their limited partnership interest in Jackson for $5,000 in 1983. Jackson was a limited partner in Wilshire West Associates (Wilshire West) during 1983 and 1984. Wilshire West was one of approximately 50 coal programs that were sponsored by Swanton Corp., a Delaware corporation, and were structured identically as either joint ventures or limited partnerships. Both Jackson and Wilshire West were partnerships subject to the procedures of the Tax Equity & Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324 (TEFRA), provisions found in Internal Revenue Code sections 6221-6233.

The Beagles jointly filed Forms 1040, U.S. Individual Income Tax Return, for 1983 and 1984. On the return for 1983, Schedule E, Supplemental Income Schedule, the Beagles deducted a net loss of $11,832.47 relating to Jackson. The Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., from Jackson for 1984, however, was not received by the Beagles until after they had filed their return for 1984. The Schedule K-1 from Jackson to the Beagles reported an ordinary loss of $1,057 for 1984. That amount was claimed by the Beagles on a Form 1040X, Amended U.S. Individual Income Tax Return, for 1984 filed in April 1985.

Donald J. Kuehne (Kuehne) was the tax matters partner (TMP) for Wilshire West for 1983 and 1984. John R. Jackson was the TMP for Jackson for 1983 and 1984. Sometime prior to December 16, 1986, the Internal Revenue Service (IRS) began an examination of Wilshire West for 1983 under the TEFRA audit procedures, and, sometime prior to October 1, 1987, the IRS began an examination of Wilshire West for 1984. Forms 872-P, Consent to Extend the Time to Assess Tax Attributable to Items of a Partnership, for Wilshire West for 1983 and 1984 were duly executed by Kuehne for Wilshire West.

At about the time that the Beagles invested in Jackson, programs promoted by Norman Swanton (Swanton) were being investigated by the IRS. Although some civil investigation of

these programs had commenced, this investigation was suspended pending a criminal investigation of Swanton. Ultimately, the Department of Justice declined prosecution.

Thirty partnerships that were involved in the Swanton programs were formed prior to 1982, and 20, including Wilshire West, were formed subsequent to the effective date of TEFRA. Test cases for litigation of the Swanton coal programs in the Tax Court were selected. In two cases docketed in 1986, trial commenced on February 8, 1988. A second trial began in January 1992. An opinion on the merits of the Swanton coal programs for years prior to the years in issue was filed October 27, 1993. Both the 1988 trial and the 1992 trial involved pre-TEFRA cases. After the 1992 trial was concluded, IRS lawyers began processing the TEFRA cases involving the Swanton coal programs.

On August 14, 1990, the IRS sent to Wilshire West and its TMP, Kuehne, a Notice of Final Partnership Administrative Adjustment (FPAA). A petition was filed in response to the FPAA by Kuehne and was docketed in the Tax Court as No. 24109-90. As of the time of this opinion, decision still has not been entered in the Wilshire West case because one or more of the partners has pursued the litigation. However, on April 15, 1999, a closing agreement was entered into on behalf of Jackson. The closing agreement provided, in part:

> (5) The portion of the taxpayer's deficiency for the taxable years 1983, 1984 and 1985 attributable to

the claimed Partnership losses is a substantial underpayment attributable to tax motivated transactions under Internal Revenue Code sec. 6621(c). Accordingly, the annual rate of interest payable on the taxpayer's income tax for the taxable years 1983, 1984 and 1985 shall be 120 percent of the adjusted rate established under Internal Revenue Code sec. 6621(b). The 120 percent interest rate applies to interest accruing after December 31, 1984.

(6) The taxpayer is not liable for any additions to tax pursuant to I.R.C. secs. 6653(a)(1), 6653(a)(2), or 6661(a) for the portion of the taxpayer's deficiencies which are based on the disallowances of the Partnership's losses and credits in any taxable years.

(7) The taxpayer is not liable for any other penalties or additions to tax in any taxable year with respect to its interest.

On March 28, 2000, the IRS mailed a letter with enclosures to the Beagles explaining how the adjustments that were made during the examination of Wilshire West affected their individual tax returns for 1983 and 1984. On June 5, 2000, the IRS assessed a deficiency of $4,432.53 for 1983 and $269.14 for 1984 against the Beagles, resulting from the adjustments made to Wilshire West that passed through to Jackson and then to the Beagles. The deficiencies resulted from disallowance of losses claimed by the Beagles from Jackson in excess of $2,500. The $2,500 amount was allowed as a deduction in 1983 equal to one-half of the Beagles' cash investment.

On May 28, 2000, the Beagles requested abatement of the interest of $22,770.39 that had accrued on their tax liability for 1983 and 1984. At that time, Robert Beagles was terminally

ill.  On November 20, 2001, the IRS Appeals office sent to

petitioner a letter of Partial Allowance--Final Determination.

That determination stated:

> Our final determination is to allow part of your
> request for an abatement of interest.  We can allow an
> abatement for the period from May 8, 1992, to April 15,
> 1999.

> We regret that we have to deny the balance of your
> abatement of interest request for the reason(s) stated
> below:

>> We did not find any errors or delays on our part
>> that merit the abatement of interest in our review
>> of available records and other information for the
>> period from April 15, 1984, to September 30, 2001.

OPINION

Section 6404(e)(1) provides, in pertinent part, that the

Commissioner may abate the assessment of interest on any

deficiency if the interest is attributable to an error or delay

by an officer or employee of the IRS (acting in his official

capacity) in performing a ministerial act.  (Amendments to

section 6404(e) in 1996 do not apply to this case because they

apply only to interest accruing with respect to deficiencies or

payments for tax years beginning after July 30, 1996.)  This

Court may order abatement where the Commissioner abuses his

discretion by failing to abate interest.  Sec. 6404(h)(1).  In

order to prevail, a taxpayer must prove that the Commissioner

exercised this discretion arbitrarily, capriciously, or without

sound basis in fact or law.  Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

In view of the partial allowance of petitioner's claim for abatement, it is necessary to address only those periods in which interest accrued between April 15, 1984, and May 8, 1992, and subsequent to April 15, 1999.  An understanding of the earlier period, however, requires an explanation of other events occurring during the period for which abatement was allowed by the Appeals office.  The period from April 15, 1999, to September 30, 2001, is explained by the chronology in our findings of fact, and petitioner has not argued that unnecessary or unexplained delay occurred during that period.

Petitioner is concerned primarily by the failure of the IRS to notify her and her husband of the deficiencies in tax for 1983 and 1984 during the time that TEFRA proceedings were pursued through the TMPs of Jackson and Wilshire West.  In that regard, it is necessary to understand the parameters of litigation over Swanton coal shelter programs.  Much of the background was explained by the testimony of Moira Sullivan, an attorney for the IRS charged with responsibility for the litigation.  Documents concerning the Swanton cases were lost as a result of the destruction of the World Trade Center on September 11, 2001.  Other explanations are found in two opinions of this Court rendered in Swanton coal program cases.

Processing of the many civil partnership cases arising out of the coal programs in which the Beagles invested was initially delayed during a criminal investigation of the promoter, Swanton. As we said in Taylor v. Commissioner, 113 T.C. 206, 212 (1999), affd. 9 Fed. Appx. 700 (9th Cir. 2001):

> "It has long been the policy of the I.R.S. to defer civil assessment and collection until the completion of criminal proceedings." Badaracco v. Commissioner, 693 F.2d 298, 302 (3d Cir. 1982), affd. 464 U.S. 386 (1984).
>
> This policy is predicated on various considerations. The often-cited reason is potential conflict between avenues of civil and criminal discovery if parallel civil and criminal cases proceed. Compare Campbell v. Eastland, 307 F.2d 478 (5th Cir. 1962), with Commissioner v. Licavoli, 252 F.2d 268 (6th Cir. 1958), affg. T.C. Memo. 1956-187. But there are other considerations such as where a party or witness may be put in a situation of testifying when the testimony may be incriminating. See United States v. Kordel, 397 U.S. 1 (1970). There is also the confusion inherent in two cases that are proceeding concurrently. It is for these reasons that generally the courts have held the civil action in abeyance while the criminal prosecution goes forth. See id. at 12 n.27; see also United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency, 461 U.S. 555 (1983), where the Supreme Court held that the delay by the United States in instituting a civil forfeiture action pending resolution of criminal charges was reasonable.

Here, after the criminal investigation was concluded without an indictment, trial commenced in 1988. Unfortunately, the litigation process was disrupted because the testimony of Swanton was stricken for violation of Rule 145, dealing with exclusion of witnesses. See Smith v. Commissioner, 92 T.C. 1349 (1989).

Different test cases were agreed to and were the subject of the trial in 1992 and an opinion was rendered in 1993 in Kelley v. Commissioner, T.C. Memo. 1993-495. The Court found in those cases that the taxpayers were not entitled to deductions that had been claimed in 1979 through 1982 in relation to the Swanton coal programs and were liable for increased interest rates under section 6621(c) as well as for penalties for negligence.

Petitioner is concerned because she was unaware of the litigation that was going on in this Court. Petitioner argues that respondent's failure to notify her about the deficiency resulted in her incurring extraordinary interest under section 6621. Under the TEFRA procedures, however, the TMP is responsible for giving various notices to the limited partners. See sec. 6223(g). Section 6230(f) expressly states:

> SEC. 6230(f). Failure of Tax Matters Partner, Etc., To Fulfill Responsibility Does Not Affect Applicability of Proceeding.--The failure of the tax matters partner, a pass-thru partner, the representative of a notice group, or any other representative of a partner to provide any notice or perform any act required under this subchapter or under regulations prescribed under this subchapter on behalf of such partner does not affect the applicability of any proceeding or adjustment under this subchapter to such partner.

Petitioner was not a person entitled to notice under any special statutory provision. See, e.g., Taylor v. Commissioner, T.C. Memo. 1992-219 ("pass through" partners in a partnership that is a partner in another entity are not entitled to receive copies of

partnership proceeding notices from the IRS).  The failure to give such notices, therefore, is not an error requiring abatement of interest.

Although it may provide no comfort to petitioner, the delays experienced in processing her case were not unusual during the period from 1984 to 1992.  A large number of tax shelter cases were filed in this Court during the late 1970s and early 1980s as a result of tax shelter programs such as those promoted by Swanton.  The large number of cases led to specialized responses by the IRS, by the Court, and by Congress.  The response of Congress included the increased rate of interest accruing under former section 6621(c) applicable to deficiencies attributable to tax-motivated transactions, as explained in H. Rept. 98-861, at 985-986 (1984), 1984-3 C.B. (Vol. 2) 239-240:

> The provision is effective with respect to interest accruing after December 31, 1984, regardless of the date the return was filed.
>
> The conferees note that a number of the provisions of recent legislation have been designed, in whole or in part, to deal with the Tax Court backlog.  Examples of these provisions are the increased damages assessable for instituting or maintaining Tax Court proceedings primarily for delay or that are frivolous or groundless (sec. 6673), the adjustment of interest rates (sec. 6621), the valuation overstatement and substantial understatement penalties (secs. 6659 and 6661), and the tax straddle rules (secs. 1092 and 1256).  * * *
>
> The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the

backlog now lies with the Tax Court.  The positive response that the Court has made to several recent GAO recommendations is encouraging and the conferees expect the Court to implement swiftly these and other appropriate management initiatives.  The conferees also note favorably the steps the Court has begun to take in consolidating similar tax shelter cases and dispensing with lengthy opinions in routine tax protestor cases. The Court should take further action in these two areas, as well as to assert, without hesitancy in appropriate instances, the penalties that the Congress has provided.

The Internal Revenue Service also has significant responsibilities in reducing the Tax Court backlog. The Service's settlement policy should be fair and flexible, and only appropriate cases should be litigated.  Although in the recent past the Service has offered to settle many tax shelter cases by permitting taxpayers to deduct out of pocket expenses, the Service no longer routinely offers this as a settlement.  This is a constructive change in policy, in that a taxpayer should not expect to be able to deduct out of pocket expenses regardless of the circumstances of his case. The Service should assert, without hesitancy in appropriate circumstances, the penalties that the Congress has provided.  In particular, the negligence and fraud penalties are not currently being applied in a large number of cases where their application is fully justified.  The conferees note with approval the steps the Service has recently taken to eliminate the backlog in the Appeals Division.

The Court's practice of selecting test cases and holding other cases in abeyance pending the resolution of the test cases was among the management tools adopted to deal with the large number of cases.  It was not feasible to litigate simultaneously hundreds of cases involving substantially similar issues.  Here, respondent's counsel turned to the group of TEFRA cases, including petitioner's partnership, as soon as the trial of the Swanton test cases concluded in 1992.  Prior to that time, the

delays are explained by the complexities and burdens of managing the cases.

In circumstances comparable to those here, in <u>Lee v. Commissioner</u>, 113 T.C. 145, 150 (1999), the Court stated:

> The mere passage of time in the litigation phase of a tax dispute does not establish error or delay by the Commissioner in performing a ministerial act. The length of time required to resolve the * * * case was a result of the Government's litigation strategy to dispose of the criminal indictments first and the Court's disposition of the parties' procedural motions. Respondent's decision on how to proceed in the litigation phase of the case necessarily required the exercise of judgment and thus cannot be a ministerial act. We, therefore, conclude that the passage of 11 years in the litigation phase of the case at bar is not attributable to error or delay in performing a ministerial act. [Fn. ref. omitted.]

See also <u>Jacobs v. Commissioner</u>, T.C. Memo. 2000-123.

In consideration of the events that were occurring from April 15, 1984, to trial of the <u>Kelley</u> cases in 1992, we cannot conclude that the passage of time is attributable to error or delay in performing a ministerial act. The Appeals officer's partial allowance of petitioner's claim gave petitioner relief of amounts accruing for approximately 7 years from May 1992 to April 1999. Although that result is not satisfactory to petitioner, we have found no basis for further relief under the circumstances.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.