T.C. Memo. 2009-120

UNITED STATES TAX COURT

JEAN MATHIA AND ESTATE OF DOYLE V. MATHIA, DECEASED, JEAN MATHIA,
PERSONAL REPRESENTATIVE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16483-05L.                    Filed May 27, 2009.

Mark W. Curnutte, for petitioners.

Ann L. Darnold, for respondent.

MEMORANDUM OPINION

MARVEL, Judge:  Pursuant to section 6330(d),[1] petitioners

seek review of respondent's determination to proceed with the

collection of petitioners' 1982, 1983, and 1984 Federal income

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

tax liabilities.  Petitioners also seek review under section 6404(h) of respondent's determination to deny petitioners' request for abatement of interest under section 6404(e).

## Background

The parties submitted this case fully stipulated under Rule 122.  The stipulation of facts is incorporated herein by this reference.

Jean Mathia (Mrs. Mathia) resided in Oklahoma when she petitioned this Court on her own behalf and as personal representative of the Estate of Doyle V. Mathia, her deceased husband.  Doyle V. Mathia (Mr. Mathia) and Mrs. Mathia[2] were married and filed joint Federal income tax returns for all relevant years.  Mr. Mathia died on February 19, 2000.

Mr. Mathia was a limited partner in Greenwich Associates (Greenwich), a New York limited partnership subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, for the relevant tax years.  Greenwich was one of approximately 50 partnerships and joint ventures participating in coal programs sponsored by the Swanton Corp., a Delaware corporation (collectively referred to as the Swanton partnerships).

---

[2]We use the term "petitioners" throughout this opinion to refer to Mr. Mathia or his estate and Mrs. Mathia.

Thirty of the Swanton partnerships were formed before the enactment of TEFRA. The remaining 20 Swanton partnerships, including Greenwich, were formed after the enactment of TEFRA and are subject to the TEFRA unified audit and litigation provisions applicable to partnerships (Swanton TEFRA partnerships).

Mr. Mathia owned an 8.484-percent limited partnership interest in Greenwich at all relevant times.[3] Mr. Mathia was neither a section 6223(a) notice partner nor a member of a notice group described under section 6223(b)(2).[4]

Kevin Smith (Mr. Smith) served as the general partner and tax matters partner (TMP) of Greenwich. Neither Mr. Mathia nor Mrs. Mathia notified respondent that Mr. Smith did not have authority to enter into a settlement agreement on their behalf.

---

[3]Mrs. Mathia, individually, was never a partner in Greenwich.

[4]Under sec. 6223(a), a partner is not entitled to notice unless the Secretary receives sufficient information to determine whether the partner is entitled to the notice and to enable the Secretary to provide the notice to the partner. Under sec. 6223(b)(2), if a partnership has more than 100 partners, a group of partners having a 5-percent or more interest in the profits of the partnership can request that one of their members receive the notice. The parties stipulated that Mr. Mathia was neither a notice partner nor a member of a notice group and that the Greenwich tax matters partner (TMP) had authority to bind all of Greenwich's partners to the stipulation of settlement. Respondent subsequently moved for relief from the designated stipulations, alleging that they were in error. In a Memorandum Opinion filed as T.C. Memo. 2007-4, we concluded that respondent was not entitled to relief from the stipulations.

Respondent determined that the only purpose of the Swanton partnerships was to generate tax deductions. On or before March 16, 1987, Greenwich received a notice of the beginning of an administrative proceeding (NBAP) for tax years 1982, 1983, and 1984.[5] On August 3, 1990, respondent issued to Greenwich a notice of final partnership administrative adjustment (FPAA) for 1982, 1983, and 1984. Mr. Smith timely filed a petition for review in this Court under section 6226 (the Greenwich litigation).

In the Greenwich litigation Greenwich was represented by Henry G. Zapruder (Mr. Zapruder) and Matthew Lerner (Mr. Lerner) of Zapruder & Odell, a law firm that served as counsel for most of the Swanton TEFRA partnerships.[6] In or about September 1991 respondent's attorneys and Zapruder & Odell reached an agreement in principle regarding the parameters of a settlement with respect to 19 of the 20 Swanton TEFRA partnerships, including Greenwich (1991 agreement). The 1991 agreement was reflected in an exchange of letters between Zapruder & Odell on behalf of the partnerships and respondent's attorneys, Robert Marino and Moira

---

[5]The record does not indicate the precise date on which respondent issued Greenwich the NBAP.

[6]In the attachment to notices of determination dated Aug. 5, 2005, issued by the Appeals Office with respect to the lien and proposed levy, the Appeals Office states that Mr. Lerner did not represent Greenwich. We find to the contrary on the basis of the stipulations of the parties.

Sullivan (Ms. Sullivan). Included in the 1991 agreement was a requirement that the TMP for each partnership sign a Rule 248(a) decision document.[7]

After respondent's attorneys and Zapruder & Odell reached the 1991 agreement, they continued to negotiate aspects of the proposed settlement. They also began the process of applying the general terms to each partnership and partner. That process included gathering and exchanging information to enable respondent to calculate partnership-level adjustments and each partner's distributive share adjustment, preparing reports showing the calculations, and preparing and executing decision documents that memorialized the terms of the proposed settlement with respect to each Swanton partnership as well as closing agreements as appropriate.

By letter dated January 10, 1992, Zapruder & Odell requested that respondent "designate someone * * * to administer the settlement of the Swanton cases." By letter dated January 15, 1992, respondent's counsel advised Zapruder & Odell that respondent had assigned another attorney, Frances Chan, "to immediately effectuate the settlement of the Swanton Partnerships." Respondent's counsel also requested verification

---

[7]Rule 248(a) states that "A stipulation consenting to entry of decision executed by the tax matters partner and filed with the Court shall bind all parties." Under Rule 248(a) the TMP's signature certifies that no party objects to entry of decision.

of each partner's investment in the 19 Swanton TEFRA partnerships that agreed to move forward with the settlement.

In July 1995 respondent sent to Mr. Lerner and Mr. Smith letters enclosing the following documents with respect to the Greenwich litigation: (1) The decision document reflecting adjustments to partnership items for each of the years 1982, 1983, and 1984; (2) the computations on which the decision document was based; (3) closing agreements for some of the Greenwich limited partners;[8] and (4) Forms 886Z(C), Partner's or S Corporation Shareholders' Shares of Income. Respondent informed Mr. Lerner[9] and Mr. Smith that limited partners in Greenwich seeking treatment deviating from the adjustments in the decision document needed to sign individual closing agreements before the decision document could be filed with the Court. The letter also stated the following:

---

[8]By letter dated sometime in July 1995, Ms. Sullivan sent to Mr. Lerner a revised closing agreement for one of the Greenwich limited partners. On that same date, Ms. Sullivan mailed copies of all amended closing agreements to Mr. Smith so that Mr. Smith could arrange for execution of the agreements by the affected partners.

[9]Although Mr. Lerner remained one of Greenwich's counsel of record until November 1999, he apparently left Zapruder & Odell in May 1996. Mr. Lerner withdrew from the Greenwich litigation in 1999.

Please understand that your signing each partnerships' [sic] Decision Documents constitutes the offer to settle that particular partnership with the Internal Revenue Service and the countersignature of the documents constitutes the Internal Revenue Service's acceptance of that offer. No settlement of any partnership will be final until these documents are countersigned by the Internal Revenue Service.

On September 11, 1996, Mr. Smith signed the decision document. On September 25, 1996, Mr. Lerner signed the decision document and returned it to respondent's attorneys that same day.

By letters dated July 17 and November 7, 1996, Greenwich's counsel mailed executed closing agreements with respect to Greenwich to Ms. Sullivan. Although none of the letters in the record disclosed how many of the Greenwich limited partners were required to sign closing agreements, the attachment to the notices of determination stated that seven partners were required to execute closing agreements before the Greenwich decision document could be signed by respondent. Mr. Mathia was not one of them.[10] The attachment also stated that the closing agreements were dated from November 12, 1999, to November 27, 2000, but did not identify the date to which it referred (e.g. date of receipt, date executed by taxpayer, date executed by respondent's agent, effective date).[11] The stipulated record

---

[10]Mr. Mathia did not execute a closing agreement, and his wife did not execute one on his behalf.

[11]The attachment further states that "The most significant delays encountered with this partnership were both in contacting
(continued...)

does not explain why the closing agreements were dated in 1999 and 2000 when they were mailed to respondent in 1996.[12]

By letter dated February 27, 2001, Ms. Sullivan sent another decision document with respect to the Greenwich litigation and the computations on which the decision document was based to Mr. Zapruder. The decision document was identical to the one mailed to Greenwich in 1995. In the letter Ms. Sullivan asked Mr. Zapruder to sign the document, to have Mr. Smith sign the document, and to return the signed decision document to her. Ms. Sullivan represented that as soon as respondent's counsel received the signed decision document, they would get it countersigned and file it immediately with the Court. Ms. Sullivan also described what would happen after the decision was entered by the Court, and she warned Mr. Zapruder that his signature on the decision document "constitutes the offer to settle" and that the countersignature "constitutes the Internal Revenue Service's acceptance of that offer." The stipulated

---

[11](...continued)
the tax matters partner, Smith, and receiving his signed 906's." However, we can find no evidence in the record other than the conclusory statement in the attachment to support a finding that the delay in executing the closing agreements was attributable to either Greenwich's TMP or its counsel.

[12]In 2004 Appeals Officer Troy Talbott attempted to find out the date by which the Internal Revenue Service had received all of the Forms 906, Closing Agreement on Final Determination Covering Specific Matters, for Greenwich, but he was apparently unable to do so.

record does not contain any explanation as to why a second decision document was mailed to Greenwich's counsel after they had already delivered the executed original of the first decision document to Ms. Sullivan on September 25, 1996.

On August 30, 2001, respondent countersigned the decision document and submitted it to this Court. The Court filed the decision document on August 31, 2001, as a stipulation of settlement (Greenwich stipulation). On September 7, 2001, this Court issued an order to show cause, directing Mr. Smith to file a written response showing cause as to why the Court should not enter a decision in accordance with the terms of the Greenwich stipulation. Mr. Smith did not file a response, and on January 17, 2002, this Court entered an order and decision resolving the Greenwich litigation. On April 17, 2002, the decision became final.

On September 27, 2002, respondent mailed petitioners a Form 4549A-CG, Income Tax Examination Changes, notifying them of a computational adjustment[13] to their 1983 income tax liability as a result of the resolution of the Greenwich litigation. On January 8, 2003, respondent notified petitioners of adjustments to their 1982 and 1984 income tax liabilities. Petitioners did

---

[13]A computational adjustment changes the tax liability of a partner to properly reflect the treatment of a partnership item. Sec. 301.6231(a)(6)-1T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6790 (Mar. 5, 1987), amended 64 Fed. Reg. 3840 (Jan 26, 1999).

not agree to waive or extend any period of limitations for the assessment of their 1982, 1983, or 1984 tax liability. On January 27, 2003, respondent assessed against petitioners the income tax deficiencies and interest for 1982, 1983, and 1984 attributable to the computational adjustments. On October 27, 2003, petitioners paid all of the tax, but not the interest, that respondent had assessed.[14]

On February 6, 2004, petitioners submitted Forms 843, Claim for Refund and Request for Abatement, requesting an abatement of the interest accrued on their 1982, 1983, and 1984 income tax liabilities under section 6404.

On February 10, 2004, respondent issued to petitioners a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing for 1982, 1983, and 1984, and petitioners timely requested a section 6330 hearing. On April 2, 2004, respondent issued to petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320, for 1983 and 1984, and petitioners timely requested a section 6320 hearing.

On April 7, 2004, respondent denied petitioners' interest abatement claim. On May 5, 2004, petitioners submitted a request to respondent's Appeals Office to review the denial of their interest abatement claim.

---

[14]Petitioners paid $149,360, $4,015, and $2,331, respectively, towards their 1982, 1983, and 1984 tax liabilities.

On October 15, 2004, Mrs. Mathia, acting individually, filed a Form 8857, Request for Innocent Spouse Relief, wherein she sought relief under section 6015 from joint and several liability for all tax liabilities attributable to Greenwich for 1982, 1983, and 1984. On July 8, 2005, respondent granted Mrs. Mathia's request for relief.

On August 5, 2005, respondent issued to petitioners a notice of determination with respect to the notice of intent to levy and a second notice of determination with respect to the notice of Federal tax lien filing. On August 18, 2005, respondent issued a final determination letter to petitioners denying petitioners' request for abatement of interest under section 6404. The final determination did not set forth any facts to explain the 5-year delay between the execution of the decision by the Greenwich TMP and counsel and the execution of the decision on behalf of respondent. The final determination simply stated that "We do not find any errors or delays on our part that merit the abatement of interest in our review of available records and other information."

On September 6, 2005, petitioners timely filed a petition contesting each of respondent's determinations. Petitioners contend that under section 6229(f), the period for assessment expired before respondent assessed petitioners' 1982, 1983, and 1984 tax liabilities. Alternatively, petitioners argue that

respondent improperly denied their interest abatement claims under sections 6404 and 6621(d).

Discussion

I.  Determination To Proceed With Lien and Levy

   A.  Section 6330(d) Review

Under section 6320(a) the Secretary[15] is required to notify the taxpayer in writing of the filing of a Federal tax lien and inform the taxpayer of his right to a hearing.  Section 6330(a) similarly provides that no levy may be made on a taxpayer's property or right to property unless the Secretary notifies the taxpayer in writing of his right to a hearing before the levy is made.  If the taxpayer requests a hearing under either section 6320 or 6330, a hearing shall be held before an impartial officer or employee of the Internal Revenue Service (IRS) Office of Appeals.[16]  Secs. 6320(b)(1), (3), 6330(b)(1), (3).  At the hearing a taxpayer may raise any relevant issue, including appropriate spousal defenses, challenges to the appropriateness

---

[15]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A).

[16]Sec. 6320(b)(4) provides that to the extent practicable, a hearing under sec. 6320 should be held in conjunction with a sec. 6330 hearing, and sec. 6320(c) provides that sec. 6330(c), (d) (other than par. (2)(B)), and (e) applies for purposes of the sec. 6320 hearing.

of the collection action, and collection alternatives. Sec. 6330(c)(2)(A). A taxpayer is precluded from contesting the existence or amount of the underlying tax liability unless the taxpayer did not receive a notice of deficiency for the tax in question or did not otherwise have an opportunity to dispute the tax liability. Sec. 6330(c)(2)(B); see also Sego v. Commissioner, 114 T.C. 604, 609 (2000).

Following a hearing the Appeals Office must determine whether the Secretary may proceed with the proposed collection action. In so doing, the Appeals Office is required to consider: (1) The verification presented by the Secretary that the requirements of applicable law and administrative procedures have been met; (2) the relevant issues raised by the taxpayer; and (3) whether the proposed collection action appropriately balances the need for efficient collection of taxes with a taxpayer's concerns regarding the intrusiveness of the proposed collection action. Sec. 6330(c)(3).

Section 6330(d)(1) grants the Court jurisdiction to review the determination made by the Appeals Office. Where the underlying tax liability is not in dispute, the Court will review that determination for abuse of discretion. Lunsford v. Commissioner, 117 T.C. 183, 185 (2001); Sego v. Commissioner, supra at 610; Goza v. Commissioner, 114 T.C. 176, 182 (2000). Where the underlying tax liability is properly at issue, the

Court reviews any determination regarding the underlying tax liability de novo.  Sego v. Commissioner, supra at 610.

Petitioners' primary argument--that the applicable period of limitations expired before respondent's assessment--constitutes a challenge to petitioners' underlying tax liability.  See Boyd v. Commissioner, 117 T.C. 127, 130 (2001).  Respondent concedes that petitioners did not have a prior opportunity to dispute whether the assessment following the completion of the Greenwich litigation was timely, and he does not question our jurisdiction to consider the issue.  Accordingly, we review respondent's determination regarding the period of limitations de novo.

B.  Burden of Proof

In Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227, 240-241 (1990), we addressed as follows the taxpayer's argument that the section 6229(a) assessment period had expired:

> The expiration of the period of limitation on assessment is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability.  Rules 39, 142(a). To establish this defense, the taxpayer must make a prima facie case establishing the filing of the partnership return, the expiration of the statutory period, and receipt or mailing of the notice after the running of the period.  Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); Robinson v. Commissioner, 57 T.C. 735, 737 (1972).  Where the party pleading the defense makes such a showing, the burden of going forward with the evidence shifts to respondent who must then introduce evidence to show that the bar of the statute is not applicable.  Adler v. Commissioner, 85 T.C. 535, 540 (1985).  Where respondent makes such a showing, the burden of going forward then shifts back to the party pleading the

affirmative defense to show that the alleged exception
to the expiration of the period is invalid or otherwise
inapplicable.  Adler v. Commissioner, supra at 540.
The burden of proof, i.e., the burden of ultimate
persuasion, however, never shifts from the party who
pleads the bar of the statute of limitations.  Adler v.
Commissioner, supra at 540.

Accordingly, if petitioners present a prima facie case that respondent failed to timely assess tax and interest under section 6229, the burden of production shifts to respondent to show that the period of limitations had not expired before the assessments. The burden of proof, however, remains with petitioners at all times.[17]  See Rule 142(a).

C.  Period of Limitations for Making Assessments

Under the TEFRA partnership provisions, the income tax treatment of partnership items ordinarily is determined through a proceeding conducted at the partnership level.  Sec. 6221. Section 6231(a)(3) defines a partnership item as any item to be taken into account for the partnership's taxable year to the

---

[17]Petitioners filed a motion to shift the burden of proof under sec. 7491(a).  Sec. 7491 shifts the burden of proof to the Secretary if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer.  However, sec. 7491 applies only to court proceedings arising in connection with examinations commencing after the date of its enactment, July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 726.  Because the examination of Greenwich and its partners commenced well before the enactment of sec. 7491, and because the computational adjustments to petitioners' 1982, 1983, and 1984 returns were made in accordance with the result of the Greenwich examination, sec. 7491(a) is inapplicable.  Consequently, we denied petitioners' motion.

extent regulations provide that the item is more appropriately determined at the partnership level than at the partner level.[18] The regulations contain an extensive list of matters that fall within the definition of partnership item.  See sec. 301.6231(a)(3)-1, Proced. & Admin. Regs.

To commence a partnership-level proceeding, the Commissioner must issue an NBAP to the TMP[19] and to all other partners entitled to notice under section 6223.  See supra note 4.  At the conclusion of the partnership-level examination, the Commissioner must send the TMP and all notice partners an FPAA detailing any adjustments made to the Form 1065, U.S. Return of Partnership Income.  Sec. 6223(a)(2).  Within 90 days of the date the FPAA is mailed to the TMP, the TMP may contest the FPAA by filing a petition in the Tax Court, the District Court for the district in which the partnership's principal place of business is located, or the Court of Federal Claims.  Sec. 6226(a).  The court in which jurisdiction is established has jurisdiction to review all partnership items for the partnership year to which the FPAA

---

[18]A nonpartnership item is defined as an item which is not a partnership item.  Sec. 6231(a)(4).  Administrative and judicial proceedings regarding nonpartnership items are not conducted at the partnership level.  See secs. 6221, 6230(a).

[19]Under TEFRA a partnership must have a TMP who is either appointed by the partnership or determined in accordance with statutory and regulatory requirements.  Sec. 6231(a)(7).

relates and to review the allocation of such items among the partners.  Sec. 6226(f).

The Commissioner is prohibited from assessing a deficiency attributable to the adjustment of a partnership item until the partnership-level proceeding is completed.  Sec. 6225.  If the TMP does not file a petition in the Tax Court, the Commissioner cannot assess any deficiency attributable to the adjustment of a partnership item until 150 days after the mailing of the FPAA to the TMP.  Sec. 6225(a)(1).  If the TMP files a petition in the Tax Court within the 150-day period, the Commissioner is prohibited from assessing any deficiency attributable to partnership item adjustments until the decision of the Tax Court becomes final.  Sec. 6225(a)(2).[20]

Section 6229(a) sets forth the period within which the Commissioner may assess any deficiency that is attributable to the adjustment of a partnership item.  It provides that the period for assessment shall not expire sooner than 3 years after (1) the date the partnership tax return was filed or (2) the due date of the partnership tax return (determined without regard to extensions), whichever is later.  See also Rhone-Poulenc Surfactants and Specialties, L.P. v. Commissioner, 114 T.C. 533, 542 (2000).  Under section 6229(d) the 3-year period described in

---

[20]The finality of a Tax Court decision is determined under sec. 7481.

section 6229(a) is suspended for the 90-day period during which an action may be brought under section 6226. Additionally, if a petition is filed challenging the FPAA under section 6226, the period within which an assessment may be made is suspended until the decision of the court becomes final, plus 1 year. Sec. 6229(d).

The period for assessment mentioned above continues to apply as long as an item remains a partnership item. See sec. 6229(f)(1). Section 6231(b), however, lists several ways in which a partnership item may be converted into a nonpartnership item during a partnership-level proceeding. Most relevant to this case, a partnership item converts into a nonpartnership item as of the date the Secretary or the Attorney General (or his delegate) "enters into a settlement agreement with the partner with respect to such items". Sec. 6231(b)(1)(C). If a partnership item converts into a nonpartnership item under section 6231(b)(1)(C), section 6229(f) provides that the period for assessing tax with respect to the converted item expires no sooner than 1 year after the date the item becomes a nonpartnership item.[21]

Respondent contends that petitioners did not execute a settlement agreement under section 6231(b)(1)(C) and that

---

[21]The period under sec. 6229(f) can be extended by agreement. Sec. 6229(f)(1).

petitioners remained a party to the Greenwich litigation under section 6226(c) until the Tax Court rendered its final decision. Thus, respondent argues, he was prohibited by section 6225(a)(2) from assessing petitioners' tax liability until the date the Court's order and decision became final. Respondent contends that he timely assessed petitioners' tax liability within the period allowed by section 6229(a) and (d) after the Court's decision became final.

Petitioners assert that the relevant partnership items converted to nonpartnership items under section 6231(b)(1)(C) by means of a settlement agreement between Mr. Mathia and respondent. Petitioners argue that Mr. Mathia reached a settlement agreement with respondent on or about September 30, 1991, through correspondence exchanged between Mr. Lerner, Greenwich's counsel, and respondent. Alternatively, petitioners argue that Mr. Mathia and respondent entered into a settlement agreement when respondent's attorney signed the Greenwich stipulation on August 30, 2001. A finding that respondent reached a section 6231(b)(1)(C) settlement agreement with Mr. Mathia in either circumstance would trigger the application of the provision contained in section 6229(f) and make respondent's assessments untimely. Accordingly, we must determine what constitutes a settlement agreement for purposes of section

6231(b)(1)(C), and we must then decide whether Mr. Mathia and respondent entered into such an agreement.

D.  Settlement Agreements Under Section 6231(b)(1)(C)

A controversy before this Court may be settled by agreement between the parties.  Dorchester Indus. Inc. v. Commissioner, 108 T.C. 320, 329 (1997), affd. without published opinion 208 F.3d 205 (3d Cir. 2000).  The term "settlement agreement", however, is not defined in the Internal Revenue Code, and section 6231(b)(1)(C) does not provide any detail as to what constitutes a settlement agreement for purposes of converting a partnership item into a nonpartnership item.  Because a settlement is a contract, however, courts generally apply principles of contract law to determine whether a settlement has been reached.  See Dorchester Indus. Inc. v. Commissioner, supra at 330; Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436, supplemented by 53 T.C. 275 (1969).

A settlement agreement can be reached through offer and acceptance made by letter, or even in the absence of a writing. Dorchester Indus. Inc. v. Commissioner, supra at 330.  Settlement of an issue before the Court does not require the execution of a closing agreement under section 7121, or any other particular method or form.  Id.  Settlement agreements are effective and binding once there has been an offer and an acceptance; filing

the agreement with the Court as a stipulation is not required for the agreement to be effective and binding.  Id. at 338.

Under TEFRA, a settlement agreement entered into by the TMP will generally bind a nonnotice partner if the settlement agreement states that the agreement is binding on the nonnotice partner.  Sec. 6224(c)(3)(A).  If a partner wants to ensure that a settlement agreement entered into by the TMP will not be binding on him, the partner can file a statement with the Secretary providing that the TMP does not have the authority to enter into a settlement agreement on that partner's behalf.  Sec. 6224(c)(3)(B).

As we discussed above, petitioners argue that Mr. Mathia entered into a section 6231(b)(1)(C) settlement agreement with respondent on two separate occasions.  We shall examine the evidence and circumstances surrounding each occasion to decide whether Mr. Mathia entered into a section 6231(b)(1)(C) settlement agreement with respondent as petitioners contend.

1.  Correspondence Between Parties

Petitioners argue that Mr. Mathia entered into a section 6231(b)(1)(C) settlement agreement with respondent in September 1991.  According to petitioners, respondent extended an offer to settle in September 1991, which Mr. Smith, Greenwich's TMP, accepted on or about September 30, 1991.  Petitioners rely upon a series of letters from Mr. Lerner to all of the partners

in the Swanton Partnerships as proof that the settlement agreement existed:

(1) A September 19, 1991, letter advising all partners in the Swanton Partnerships to "accept the Government's settlement offer which was communicated to us this week";

(2) a November 8, 1991, letter indicating that the offer communicated in the September 19, 1991, letter had been accepted by 19 of the 20 Swanton TEFRA partnerships (including Greenwich). The letter stated that the cases had been settled, and that only the preparation of decision documents and closing agreements memorializing the terms of the settlement remained outstanding;

(3) a January 10, 1992, letter from Mr. Lerner to respondent inquiring about respondent's progress in implementing the settlement; and

(4) a March 13, 1992, letter referencing the settlement that occurred in 1991 and informing the partners that the settlement was being finalized.

As further proof that Mr. Mathia and respondent entered into a settlement agreement in September 1991, petitioners rely on a series of letters from respondent:

(1) A letter dated January 14, 1992, in which respondent's attorney informed Mr. Lerner that he was appointing an attorney to effect the settlement of the Swanton TEFRA Partnerships;

(2) a letter dated in October 1992 that was received by Zapruder & Odell on October 26, 1992, in which respondent's attorney stated that "we agreed to enter into the settlement agreement" on the basis that the TMP for each partnership was settling the case on behalf of all partners;

(3) a letter dated April 9, 1993, in which respondent's attorney listed the "terms on which we agreed on September 30, 1991";

(4) a letter dated June 11, 1993, that discussed "terms of settlement" and other "computational issues" affecting the settlement process; and

(5) a letter dated September 3, 1993, again discussing the "terms of the settlement" and other various issues pertaining to the settlement.

Although the above-described correspondence confirms that Greenwich and respondent reached an agreement in 1991 to enter into a settlement of the partnership-level proceeding, we remain unconvinced that the agreement was sufficiently fleshed out in 1991 to constitute a binding settlement agreement at that time. The agreement in principle that was reached in 1991 set forth the parameters of a settlement, but the correspondence described above reflects that negotiations continued between respondent and the attorney representing the Swanton TEFRA partnerships to at least September 3, 1993. Moreover, the correspondence indicates

that the execution of a decision document resolving the partnership litigation depended upon the fulfillment of certain conditions such as the TMP's ability to represent that all partners consented to the settlement.[22]  Implementing and finalizing the proposed settlement required the collection and analysis of detailed information, the preparation of calculations and agreements, and in some cases, the execution of closing agreements by individual partners.

Even if we assume, however, that respondent and the Greenwich TMP entered into a binding settlement agreement to resolve the partnership litigation in 1991, we would still conclude that agreement did not qualify as a settlement agreement between a partner and the Secretary within the meaning of section 6231(b)(1)(C).  The basis for our conclusion is set forth below.

Section 6231(b)(1)(C) refers only to settlement agreements reached between the Secretary or the Attorney General (or his delegate) and a partner.  Section 6231(b)(1)(C) does not contain any reference to an agreement between the Secretary and a TMP with respect to a partnership-level proceeding.  The wording of

---

[22]Among other things, the settlement of the partnership-level proceeding was conditioned upon the TMP's executing a stipulation consenting to the entry of decision under Rule 248(a), which, when filed with the Court, would be binding on all parties, including individual partners.  Under Rule 248(a), the TMP's signature on the stipulation "constitutes a certificate by the tax matters partner that no party objects to entry of decision."

section 6231(b)(1)(C) presents us with the real issue at hand: does a settlement agreement between the Secretary and a TMP resolving a partnership-level proceeding under sections 6221-6231 constitute a settlement agreement with a partner with respect to the partnership items of the partner under section 6231(b)(1)(C)?

In Crnkovich v. United States, 41 Fed. Cl. 168 (1998), affd. per curiam 202 F.3d 1325 (Fed. Cir. 2000), which also involved Swanton TEFRA partnerships, the U.S. Court of Federal Claims examined two agreements reached in two separate actions.[23] In the first action, the court held that the taxpayer-partners entered into a section 6231(b)(1)(C) settlement agreement when they executed a Form 906, Closing Agreement on Final Determination Covering Specific Matters. Id. at 175. In the second action, the court held that a stipulation of settlement entered into between individual taxpayer-partners and the Commissioner constituted a settlement agreement under section 6231(b)(1)(C). Id. at 178. In reaching both conclusions, the court focused on the intent of the parties to enter into a binding, conclusive agreement governing the settlement of disputed partnership items. Id. at 173, 179. The court also examined the role that a section 6231(b)(1)(C) settlement

---

[23] Two of a total of five consolidated actions were before the court on cross-motions for summary judgment. Crnkovich v. United States, 41 Fed. Cl. 168, 169 (1998), affd. per curiam 202 F.3d 1325 (Fed. Cir. 2000).

agreement is intended to serve under the TEFRA partnership

provisions:

> At the time the IRS entered the Form 906 agreement, it
> faced competing incentives in determining how best to
> handle the partnership tax issues presented for the
> * * * [taxpayers'] post-1982 tax years.  On the one
> hand, as reflected by the TEFRA partnership provisions,
> it ordinarily is efficient for the IRS to make the
> determination as to the tax treatment of partnership
> items at the partnership level. On the other hand,
> because the IRS was in the process of negotiating with
> the * * * [taxpayers] on an individual partner level
> with respect to pre-TEFRA tax years, there were
> potential efficiencies in also dealing with the * * *
> [taxpayers] individually with respect to post-TEFRA tax
> years.  In the Form 906 agreement, the IRS resolved
> these competing incentives by deciding to deal with the
> * * * [taxpayers] individually and apart from any
> partnership-level determinations.  For certain tax
> issues, the bilateral agreement establishes the terms
> that control the * * * [taxpayers'] personal tax
> liability without providing an exception in the event
> of a contrary resolution of the same tax issues at the
> partnership level.  Hence, in entering the Form 906
> agreement, the IRS chose to forego the advantages of
> making its determinations at the partnership level and
> opted instead to deal with the * * * [taxpayers]
> individually with respect to the tax issues addressed
> in the Form 906 agreement.  Entering into a "settlement
> agreement" under I.R.C. § 6231(b)(1)(C) is a statutory
> method of exercising such a choice.  [Id. at 174-175;
> emphasis added.]

The court's analysis in Crnkovich illustrates an important

distinction between a settlement agreement reached at the

partnership level by a partnership's TMP and a settlement

agreement reached directly with an individual partner.  When a

partner enters into a settlement agreement individually, as each

taxpayer did in Crnkovich v. United States, supra, he removes

himself from the partnership proceeding and allows the

Commissioner to resolve his tax liability on an individual basis. In such a case the disputed partnership items are no longer more appropriately determined at the partnership level, and section 6231(b)(1)(C) operates to convert the partner's partnership items to nonpartnership items. This conversion allows the Commissioner to proceed with assessment and collection against the individual partner under section 6229(f) in accordance with the terms of the settlement, free of the TEFRA-imposed restrictions on assessment mentioned above. See sec. 6225.

The 1991 agreement reached by respondent and Mr. Lerner on behalf of the Swanton TEFRA partnerships outlined in principle the terms that would govern a settlement of the partnership litigation involving 19 of 20 Swanton TEFRA partnerships. It did not reflect an agreement to settle any individual partner's liability resulting from adjustments to partnership items outside of the partnership-level proceeding. Consequently, the agreement did not operate to remove Mr. Mathia or any other partner from the partnership-level proceeding. Instead, the agreement started a process that culminated with the filing of the Greenwich stipulation and the Court's entry of decision. After the decision resolving the partnership litigation became final, respondent adjusted petitioners' tax liability in accordance with the decision resolving the partnership litigation as required and permitted by sections 6221-6231.

We conclude on the record before us that the agreement reached between respondent and Mr. Lerner was an agreement relating to the TEFRA partnership proceeding on behalf of the Swanton TEFRA partnerships (including Greenwich) and was not an agreement between respondent and Mr. Mathia that operated to convert Mr. Mathia's partnership items into nonpartnership items as contemplated by section 6231(b)(1)(C).

### 2. Greenwich Stipulation

Petitioners also argue that Mr. Mathia entered into a section 6231(b)(1)(C) settlement agreement on August 30, 2001, when respondent countersigned the Greenwich stipulation. Respondent disagrees, arguing that the Greenwich stipulation is not a settlement agreement of the type described in section 6231(b)(1)(C). According to respondent, the Greenwich stipulation offered by petitioners does not use the phrase "terms of settlement", addresses issues solely at the partnership level, and functions only to settle the partnership-level proceeding.

We agree with respondent. As with the 1991 agreement, the adjustments to partnership items in the Greenwich stipulation were adjustments to be made at the partnership level. Under Rule 248(a), Mr. Smith agreed to the adjustments to the disputed partnership items on behalf of Greenwich partners (including Mr. Mathia) who did not enter individual closing agreements. The adjustments agreed upon were made to items reported on

Greenwich's partnership return, and the stipulation made no reference to the individual liability of Greenwich partners. Thus, while the stipulation was executed by Mr. Smith in his capacity as the TMP who possessed the necessary authority to bind Mr. Mathia and/or his estate, the stipulation reflected an agreement regarding the treatment of partnership items that was reached by and with the partnership. The stipulation did not qualify as "a settlement agreement with the partner" with respect to partnership items within the meaning of section 6231(b)(1)(C). A settlement agreement under section 6231(b)(1)(C) operates to convert a partner's distributive share of partnership items to nonpartnership items and enables the Commissioner to assess that partner's deficiency without regard to the restriction on assessment set forth in section 6225(a)(2). Respondent was prohibited by section 6225(a)(2) from assessing deficiencies attributable to the Greenwich partnership items until this Court had entered a decision in the partnership proceeding and that decision had become final under section 7481.

We conclude that neither Mr. Mathia nor his estate entered into a settlement agreement with respondent that qualified as a settlement agreement with a partner within the meaning of section 6231(b)(1)(C). Accordingly, the disputed partnership items were not converted to nonpartnership items, and the period for assessment under section 6229(d) remained open for the

assessments at issue here.  Under section 6225(a)(2), respondent was restricted from assessing deficiencies attributable to the partnership item adjustments set forth in the Greenwich stipulation until April 17, 2002, the day the Court's decision became final.[24]  Under section 6229(d), respondent's January 27, 2003, assessment is timely because it occurred within 1 year of the decision's becoming final.  We hold, therefore, that respondent is not barred by section 6229(f)(1) from assessing and collecting petitioners' unpaid tax liability.

## II.  Abatement of Interest

Section 6601(a) provides, in general, that if any amount of tax imposed by the Code is not paid on or before the last date prescribed for payment, interest on such amount must be paid for the period from such last date to the date paid at the underpayment rate established under section 6621.  Section 6611(a) similarly provides that interest must be allowed and paid on any overpayment in respect of any internal revenue tax at the overpayment rate established under section 6621.  Section 6621(d) provides for the elimination of interest on overlapping periods

---

[24]Under sec. 7481 decisions of the Court shall become final upon the expiration of the time allowed for filing a notice of appeal if no such notice has been duly filed within such time. Under sec. 7483 a taxpayer has 90 days to file a notice of appeal after the decision of the Court is entered.

of tax overpayments and underpayments.[25]  To the extent that for any period interest is payable and allowable on equivalent underpayments and overpayments by the same taxpayer, the net rate of interest under section 6621 on such amounts is zero for such period.  Sec. 6621(d).

Section 6404(e), as it applies to this case,[26] provides in pertinent part:

> SEC. 6404(e).  Assessments of Interest Attributable to Errors and Delays by Internal Revenue Service.--
>
> (1) In general.--In the case of any assessment of interest on--
>
> > (A) any deficiency attributable in whole or in part to any error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial act * * *
>
> *    *    *    *    *    *    *
>
> the Secretary may abate the assessment of all or any part of such interest for any period.  * * *

---

[25]However, sec. 6621(d) generally is effective with respect to interest for periods beginning after July 22, 1998.  RRA 1998 sec. 3301, 112 Stat. 741.

[26]In 1996 Congress amended sec. 6404(e)(1) to permit abatement of interest for unreasonable error or delay in performing a ministerial or managerial act.  Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 301, 110 Stat. 1457 (1996).  The amendments to sec. 6404(e)(1), however, apply only to interest accruing with respect to deficiencies or payments for tax years beginning after July 30, 1996.  Id.  Accordingly, the amendments do not apply in this case.

A ministerial act is a procedural or mechanical act that does not involve the exercise of judgment or discretion and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and reviews by supervisors, have taken place. Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).[27] A decision concerning the proper application of Federal tax law is not a ministerial act. Id. The Secretary will not grant an abatement of interest if a significant aspect of the delay is attributable to the taxpayer. Sec. 6404(e)(1).

When Congress enacted section 6404(e), it did not intend the provision to be used routinely to avoid payment of interest. Rather, Congress intended abatement of interest only where failure to do so "would be widely perceived as grossly unfair." H. Rept. 99-426, at 844 (1985), 1986-3 C.B. (Vol. 2) 1, 844; S. Rept. 99-313, at 208 (1986), 1986-3 C.B. (Vol. 3) 1, 208. Under section 6404(h)(1), we have jurisdiction to determine whether the Commissioner abused his discretion in denying a taxpayer's request for abatement of interest. Because the Commissioner's abatement authority involves the exercise of discretion, however, we must give due deference to the Commissioner's determination.

---

[27]Because the taxes in question are for years before 1996, the temporary regulations (rather than the final ones) are applicable, though the same in substance insofar as relevant here.

Woodral v. Commissioner, 112 T.C. 19, 23 (1999); Mailman v. Commissioner, 91 T.C. 1079, 1082 (1988). In order to prevail, a taxpayer must prove that the Commissioner abused his discretion by exercising it arbitrarily, capriciously, or without sound basis in fact or law. Woodral v. Commissioner, supra at 23; Mailman v. Commissioner, supra at 1084; see also sec. 6404(h)(1); Rule 142(a).

Petitioners contend that they are entitled to an abatement of interest for three periods beginning on December 27, 1984, when petitioners allege respondent issued the first Greenwich NBAP, to August 25, 2003.[28] Our analysis of each period is set forth below.

A. <u>Period From December 27, 1984, to August 3, 1990</u>

Petitioners assert that respondent issued NBAP's with respect to Greenwich's 1983 and 1984 tax years which Greenwich received on December 27, 1984, and March 16, 1987, respectively, and that respondent took an unreasonable amount of time by not providing a further response until August 3, 1990, when respondent issued to Greenwich the FPAA for tax years 1982, 1983, and 1984. Petitioners allege that the interest that accrued during this period was attributable to delays resulting

---

[28]Petitioners erroneously contend that Aug. 25, 2003, was the date respondent issued the notice of intention to levy to Greenwich.

from the uncoordinated involvement of multiple IRS districts and that the lack of coordination was a ministerial act.

Petitioners' argument is not supported by the record.  In Beagles v. Commissioner, T.C. Memo. 2003-67, a case also involving the tax liability of a partner in a Swanton partnership, we set forth some of the history behind the Swanton partnership litigation, and we held that the Commissioner was not erroneous or dilatory in performing a ministerial act between April 15, 1984, and May 8, 1992.  During this period the Department of Justice conducted a criminal investigation of Norman Swanton (Mr. Swanton), the individual behind the formation and promotion of the Swanton coal programs.  Id.  During the investigation civil proceedings were suspended in accordance with established IRS policy.[29]  After the period of limitations for prosecution expired, the criminal investigation of Mr. Swanton terminated.  In 1988 litigation involving the pre-TEFRA Swanton partnerships commenced in this Court.  That litigation continued until approximately September 1993.[30]  Id.  During the pendency

---

[29]The delay of a civil matter until the resolution of a related criminal matter is a longstanding policy of the IRS. Taylor v. Commissioner, 113 T.C. 206, 212 (1999) (citing Badaracco v. Commissioner, 693 F.2d 298, 302 (3d Cir. 1982), revg. T.C. Memo. 1981-404, affd. 464 U.S. 386 (1984)), affd. 9 Fed. Appx. 700 (9th Cir. 2001).

[30]Several test cases were tried in 1992, and an opinion was filed in 1993 in Kelley v. Commissioner, T.C. Memo. 1993-495 (taxpayers not entitled to deductions claimed in relation to

(continued...)

of the pre-TEFRA partnership litigation, respondent made a managerial decision to suspend proceedings involving the Swanton TEFRA partnerships.

The mere passage of time during the litigation phase of a dispute does not establish an error or delay by the Commissioner in performing a ministerial act because decisions about how to proceed in the litigation phase of a case necessarily involve discretion.  Lee v. Commissioner, 113 T.C. 145, 150-151 (1999). In the context of the Swanton partnership litigation, we have uniformly held that decisions made by the IRS regarding the management of the Swanton project were not ministerial acts. See, e.g., Jaffe v. Commissioner, T.C. Memo. 2004-122, affd. 175 Fed. Appx. 853 (9th Cir. 2006); Dadian v. Commissioner, T.C. Memo. 2004-121; Deverna v. Commissioner, T.C. Memo. 2004-80; Beagles v. Commissioner, supra.

---

[30](...continued)
Swanton coal programs).  As we stated in Beagles v. Commissioner, T.C. Memo. 2003-67:

> The Court's practice of selecting test cases and holding other cases in abeyance pending the resolution of the test cases was among the management tools adopted to deal with the large number of cases.  It was not feasible to litigate simultaneously hundreds of cases involving substantially similar issues.  Here, respondent's counsel turned to the group of TEFRA cases, including petitioner's partnership, as soon as the trial of the Swanton test cases concluded in 1992. Prior to that time, the delays are explained by the complexities and burdens of managing the cases.

Respondent's decisions and actions during this period were managerial and involved the exercise of discretion.  We conclude that respondent did not abuse his discretion by denying petitioners' request for abatement of interest for the period from December 27, 1984, to August 3, 1990.

B.  November 8, 1991, to August 30, 2001

During this period, petitioners claim, respondent was dilatory in processing the closing agreements and Rule 248(a) decision document necessary to consummate a settlement of the Greenwich partnership litigation after the parties reached an agreement in principle in or around November 1991.  Petitioners argue that respondent took an unreasonable amount of time (nearly 4 years) to issue the decision document to Greenwich on July 3, 1995, and an even more unreasonable amount of time (nearly 5 years) to countersign the decision document on August 30, 2001, after Mr. Lerner had executed it on behalf of the partnership and returned it to respondent in September 1996.  Petitioners argue that the processing of these documents was a ministerial act and that respondent's delay in finalizing the Greenwich settlement entitles petitioners to an abatement of interest that accrued during this period.

The record with which we are presented confirms that the 1991 agreement presented a challenge that involved the collection of information and the preparation of documents for 19 Swanton

TEFRA partnerships and each of the partners.  Nevertheless, we must examine the record for evidence pertaining to the manner in which respondent implemented and finalized the Greenwich settlement.

The notice of determination denying petitioners' abatement request contains no explanation of what transpired from November 8, 1991, to August 30, 2001.  It simply states that respondent did not find any errors or delays that merit the abatement of interest.  Consequently we review the record stipulated by the parties for what it tells us about the Greenwich settlement process from November 8, 1991, to August 30, 2001.

The record reveals the following.  In approximately September 1991 respondent's attorney and Greenwich's attorney reached an agreement in principle to settle the TEFRA partnership litigation pending in this Court.  On July 3, 1995, respondent's attorney mailed to Greenwich's counsel the decision document and the closing agreements for execution by counsel, Greenwich's TMP, and the partners named in the closing agreements.  On September 25, 1996, Greenwich delivered the decision document signed by the TMP and Greenwich's counsel to respondent.  On July 17 and November 7, 1996, closing agreements were mailed to respondent's counsel, Ms. Sullivan.  On February 27, 2001, Ms. Sullivan sent another decision document to Greenwich's counsel

and requested that it be executed.  On August 30, 2001, a representative of respondent countersigned the decision document and submitted it to this Court.

The stipulated record reveals the following gaps in the processing of the Greenwich paperwork:  (1) An approximately 4-year gap between the 1991 agreement and July 3, 1995, when the decision document and the closing agreements were mailed to Greenwich, (2) an approximately 1-year gap between July 3, 1995, and November 7, 1996, the last date that the stipulated record shows closing agreements were mailed to respondent's counsel, and (3) an approximately 5-year gap between November 8, 1996, and August 30, 2001, when the decision document was countersigned by respondent.  We examine each of the gaps to decide whether respondent abused his discretion regarding the abatement of interest.  In making the examination, we assume that the stipulated record includes the administrative file that was available to respondent when he made his decision not to abate interest.

With respect to the first gap, the stipulated record establishes that after the 1991 agreement was reached, the parties to the Greenwich partnership litigation gathered and exchanged information necessary to identify the Greenwich partners who were required to execute closing agreements, and respondent prepared necessary computations as well as the

Greenwich decision document and closing agreements. That process was complicated and took time. Although the approximately 4-year gap was substantial, we see nothing in the stipulated record that supports a conclusion that the first gap was the result of unreasonable delay by respondent in performing a ministerial act. Rather, the stipulated record reflects that the process of implementing the settlements of the Swanton TEFRA partnerships was a managerial nightmare requiring cooperation over an extended period to prepare necessary calculations and paperwork and to ensure that the TMPs could satisfy respondent's requirement that they certify no partner objected to the settlement of the partnership actions. Petitioners' complaint here is grounded in a concern about the management of the settlement process, but section 6404(e) as then in effect does not permit us to abate interest for managerial decisions.

With respect to the second gap, the stipulated record indicates that respondent mailed the decision document and the closing agreements to Greenwich, and Greenwich took approximately 1 year to return the executed decision document and the closing agreements to respondent. We see nothing in the stipulated record that supports a conclusion that the second gap was the result of any unreasonable delay by respondent in performing a ministerial act.

The third gap of approximately 5 years requires a different conclusion, however.  The stipulated record is substantial and includes paperwork generated by respondent as well as correspondence between respondent and Greenwich.  The stipulated record reflects that Greenwich delivered an executed decision document to respondent's counsel on September 25, 1996, and that Greenwich also mailed signed closing agreements to respondent on July 17 and November 7, 1996.  Although the stipulated record does not clearly reflect that all of the Greenwich closing agreements were included in the two mailings, there is no correspondence in the administrative record to suggest that any of the required closing agreements were missing or that Greenwich's TMP and attorneys were dilatory in any way. Consequently, we infer from the documents that no later than November 1996 Greenwich had returned the necessary documents to respondent's counsel and that the only steps necessary to consummate the Greenwich settlement were the ministerial acts of countersigning the decision document and the closing agreements and filing the decision document with the Court.

The stipulated record, however, contains no credible explanation of the 5-year gap between the delivery of closing agreements on November 7, 1996, and the countersigning on August 30, 2001, of the decision document, which was filed with the Court as a stipulation of settlement on August 31, 2001.  In

addition, the stipulated record reflects that on February 27, 2001, respondent's counsel sent a second decision document to Greenwich's counsel that was identical to the first decision document executed by Greenwich in 1996, a development that suggests that respondent may have lost the original executed decision document.

In Jacobs v. Commissioner, T.C. Memo. 2000-123, we addressed a situation where the basis for the Commissioner's determination not to abate interest had not been clearly explained either in the final determination or at trial. We noted that an agency must cogently explain why it has exercised its discretion in a given manner, see Motor Vehicle Manufacturers Association of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48-49 (1983), and that an agency's exercise of discretion that is not adequately explained is an abuse of discretion because it is without rational explanation, see Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984). In Jacobs v. Commissioner, supra, we also stated the following:

> The Commissioner is in the best position to know what actions were taken by IRS officers and employees during the period for which petitioners' abatement request was made and during any subsequent inquiry based upon that request. If we were to uphold the Commissioner's determination not to abate interest where the Commissioner has not clearly explained the basis for the exercise of that discretion, we would be condoning a review framework that would encourage the Commissioner to provide as little information as possible about the handling of cases during the period

of the abatement request and about the inquiry in
response to the request.  * * *

We have a similar dilemma in this case.  The notice of determination contains no explanation of how respondent exercised his discretion and does not recite any facts in support of the exercise of that discretion.  Although the stipulated record provides many of the relevant facts, it fails to provide critical information that only respondent would have.  For example, the stipulated record does not establish the date when all of the closing agreements were received by respondent's attorneys or indicate what respondent did with the closing agreements he received in 1996.  The only credible evidence in the record[31] regarding respondent's receipt of closing agreements establishes that closing agreements were sent to respondent in July and November 1996.  In the absence of contrary evidence, we infer that respondent had the closing agreements no later than November 1996.  The stipulated record does not explain the delay on the part of respondent in countersigning and filing the Greenwich decision document.

---

[31]Although the notices of determination issued under secs. 6320 and 6330 contain a conclusory statement to the effect that the delay was attributable to Greenwich, we conclude that the statement is not credible because there is nothing in the stipulated record other than this statement to support a finding that any part of the delay was attributable to Greenwich.  In fact the credible evidence in the record is to the contrary. Greenwich requested prompt processing of the proposed settlement and promptly returned the executed decision document and the closing agreements.

In <u>Dadian v. Commissioner</u>, T.C. Memo. 2004-121, also a Swanton TEFRA partnership case, we found that the Commissioner's task of countersigning the closing agreement was a ministerial act and that because the Commissioner took an unreasonable amount of time to countersign, the taxpayer was entitled to abatement of interest.

The present case, like the <u>Dadian</u> case, involved the ministerial act of countersigning the relevant settlement document.  Although Mr. Mathia did not execute an individual closing agreement as the taxpayer did in <u>Dadian</u>, the processing of the Greenwich settlement as to Mr. Mathia and other Greenwich partners depended upon the execution of closing agreements by limited partners and by respondent, and upon the execution of a decision document by Greenwich and respondent.  The record reflects that respondent prepared and mailed out the relevant decision document and closing agreements in 1995 and received the signed documents in 1996.  However, the Greenwich decision document was not countersigned and filed with this Court until 2001.  The delay in performing this ministerial act is not explained in the record.

Because the delay in countersigning the decision document is not explained by credible evidence in the stipulated record, we conclude that respondent abused his discretion in refusing to

abate interest for the period from November 8, 1996, to
August 30, 2001.

C.  August 30, 2001, to August 25, 2003

Petitioners argue that they are entitled to abatement of
interest accrued from August 30, 2001, the date the Greenwich
stipulation was signed, to August 25, 2003, the date they allege
respondent issued the notice of intent to levy.[32]  Petitioners
assert that the issuance of the notice is a ministerial act which
respondent was dilatory in performing.

Respondent could not assess income tax liabilities of
individual partners bound by the decision entered in the
Greenwich partnership litigation until the decision became final.
See sec. 6229.  The Court's order and decision in the Greenwich
litigation became final on April 17, 2002.  Under section
6229(d)(2), respondent had 1 year to assess the tax resulting
from adjustments in the Greenwich stipulation.  Respondent
assessed petitioners' liabilities for 1982, 1983, and 1984 on
January 27, 2003, less than 1 year after the decision became
final.[33]  The stipulated record does not reveal any unreasonable

---

[32]We have found that respondent issued the notice of intent
to levy on Feb. 10, 2004.

[33]In several of the Swanton TEFRA partnership cases that we
have decided, we found that some of the Internal Revenue
Service's files were destroyed as a result of the destruction of
the World Trade Center on Sept. 11, 2001.  See, e.g., Dadian v.
Commissioner, T.C. Memo. 2004-121; Beagles v. Commissioner, T.C.

(continued...)

or unexplained delay in performing a ministerial act for this part of the period.

For the remaining period, January 28, 2003, through February 10, 2004, the stipulated record shows that respondent mailed required notices of the assessments to petitioners, conducted an investigation to identify levy sources and evaluate whether a levy was appropriate, issued a notice and demand for payment to petitioners, and made an administrative decision to issue a notice of intent to levy. The process used by the IRS to decide whether to proceed with collection by levy requires managerial evaluation and the exercise of judgment and does not consist solely of ministerial acts. That process was followed in this case. Because we cannot identify any unreasonable delay in performing a ministerial act during this period, we sustain respondent's determination as to the entirety of this period.

We conclude that respondent did not abuse his discretion by denying petitioners' request for interest abatement for the period from August 30, 2001, to August 25, 2003.

D. Section 6621(d)

Lastly, petitioners request abatement of interest resulting from application of the "global netting" concept of section

---

[33](...continued)
Memo. 2003-67. The stipulated record, however, does not establish whether any of the Greenwich partnership litigation files were also destroyed on Sept. 11, 2001.

6621(d).  Petitioners assert that the termination of the Greenwich partnership in 1987 released Mr. Mathia from his share of certain partnership debt, resulting in $234,975 of income being reported on petitioners' 1987 income tax return.  According to petitioners, this figure represents the amount by which Mr. Mathia's cumulative deductions with respect to Greenwich in 1982, 1983, and 1984 exceeded his cash outlay for his interest in Greenwich.  Petitioners argue that they should be allowed, for interest abatement purposes only, to reverse the income reported in 1987 in connection with the disallowance of the related deductions in 1982, 1983, and 1984.  Petitioners further allege that reversal of the 1987 income results in an overpayment of $20,233 for that year and that interest on this overpayment should be allowed to offset and "zero out" the interest accruing on the 1982, 1983, and 1984 deficiencies.

Petitioners' argument is without merit for several reasons. First, section 6621(d) generally is effective for interest for periods beginning after July 22, 1998.  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3301, 112 Stat. 741.  Second, although a special rule was enacted that mitigates the effective date provision described above for periods beginning before July 22, 1998, petitioners do not appear to satisfy its requirements.  Id. sec. 3301(c)(2), 112 Stat. 741, as amended by Omnibus Consolidated and Emergency Supplemental

Appropriations Act, 1999, Pub. L. 105-277, sec. 4002(d), 112 Stat. 2681-906 (1998). Finally, even if section 6621(d) were to apply to the periods at issue, for there to be a netting of overpayment and underpayment interest under section 6621(d) there must be an overpayment generating interest owed to the taxpayer. An overpayment begins to accrue interest on the date of payment of the first amount which is in excess of the tax liability. Sec. 301.6611-1(b), Proced. & Admin. Regs. Petitioners never made an overpayment with regard to their 1987 tax liability.[34] Petitioners' 1987 income tax return reported a tax liability of $19,473, and respondent assessed additional tax of $23,698 on May 3, 1993. Petitioners paid the full amount of the tax assessed, plus accrued interest and penalties, and petitioners' 1987 tax account balance is zero. Because there is no overpayment, there is no overpayment interest payable to petitioners. Respondent properly denied petitioners' claim for interest netting.

III. Respondent's Collection Actions

The only issues raised with respect to respondent's collection actions were the limitations issue and the interest abatement issue. We conclude that the requirements of sections

---

[34]According to the 1991 agreement, any partner who reported any debt forgiveness income in 1987 was entitled to file a claim for refund for the tax paid on that income. Petitioners did not file a claim for refund with respect to any 1987 debt forgiveness income.

6320 and 6330 have been satisfied and that respondent may proceed with collection except to the extent set forth in this opinion.

IV.  Conclusion

We have considered all the other arguments made by petitioners, and, to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

Because we conclude that petitioners are entitled to interest abatement for the period from November 8, 1996, to and including August 30, 2001, petitioners' unpaid liability for purposes of sections 6320 and 6330 must be recalculated to reflect our holding.  We shall enter a decision authorizing respondent to proceed with collection once respondent has abated interest in accordance with this opinion and has so advised the Court and petitioners.

To reflect the foregoing,

An appropriate decision will
be entered.